2412047, Arthur Anderson et al. v. Lockheed Martin Corporation et al. I'm sorry. Looks like I called these cases out of order. It's number 24180 and 2410416, Michael Davis v. Lockheed Martin. I had the same order as you originally had. Well, it doesn't matter to me. I brought my notes for the other one. Tell us which one it is. If I'm in error. Oh, okay. All right, so this is Anderson. I'm happy to go. Or no. No. So it's Davis. Yes, Davis and DeMilt, the consolidated cases. All right, thank you. Good morning, Your Honor. Josh Autry for the appellants in this case and the companion case, which we'll argue after this. These consolidated appeals deal with the district judge's exclusion of the general causation expert, Dr. Cantor, on multiple sclerosis as well as Parkinson's disease. The analysis that the district court gave, the factual analysis, spans about five pages in each opinion. In these five pages, I believe there are five errors. All of these errors are cumulative in the fact that the district court used these errors to not look at the totality of the evidence and excluded Dr. Cantor's review of the totality of the evidence. And so these errors, even if in isolation they would not be an abusive discretion, they are an abusive discretion in the aggregate. Starting on page 7 for Davis and page 9 for DeMilt, the district court said that statistically insignificant associations are not relevant. And so the district court eliminated from its review Dr. Cantor's look at studies that were indicative of an association, even if they did not on their own prove an association. Second, on page 8 in Davis and page 10 in DeMilt, the district court speculated, quote, there are apparently studies out there with significant relevant to causation results showing there is no association, end quote. So the district court surmised that there is contrary evidence out there and excluded Dr. Cantor on the basis of contrary evidence that's not in the record. Third error, on page 9 in Davis and page 11 in DeMilt, the court excluded and did not consider evidence of solvent studies, which are occupational environmental studies, because there are multiple types of solvents. The court even did not consider studies that addressed the solvents at issue in this case, which are PCE, TC, and styrene. The district court said, quote, none of the studies he looked at had solvent mixtures with only the five substances, end quote. Isn't that true for MS? We do cite studies that address the specific substances at issue, in addition to studies that are organic solvents in general. I know you might. I'm talking about Dr. Cantor. Yes.  Yes, so Dr. Cantor cites the same studies that we cite in our appeal. So for the Berrigan-Martinez 2012 study, that's... Here's why I asked, or at least one reason why I asked. At his deposition, and I'm looking at docket entry 138-3 at page 114, he's asked the question whether he cited, quote, any epidemiological studies in his, your, it was your in there, but I'm saying his, his report in which authors conclude that multiple sclerosis was caused by exposure to only one of the substances evaluated in the report. The answer is I don't believe so. And then he's asked right afterwards, do you cite any epidemiological studies in your report in which the authors conclude that multiple sclerosis was caused by a mixture of only those chemicals you analyzed in the report? And he says no. Why is that not sufficient evidence from which the district court here could have found that at least with regard to multiple sclerosis, not Parkinson's, at least with regard to MS, that there was no report citing just either one or a mixture of just those chemicals that are issued as opposed to other chemicals which could have been the cause? Because that's not how human studies work for occupational and environmental exposures. You, when you step outside, you are not breathing just oxygen. You're breathing everything else in the atmosphere. Same thing in this courtroom, same thing when we drink our drinking water, depending on the level of filtration it goes through. Yes, but, but for, there's ways to filter out those things in the reports. That's the way science does. You isolate the variables and discount the other variables to isolate that which is caused. That's the entire point of epidemiology. But with regard to Parkinson's, if we want to make it specific to this case, there clearly are reports that do that. There's at least one that I know of that does that. And so obviously it can be done. I just don't see how it could be error. You came to us and said there are five errors. You went through number three. I don't see how that could possibly be error when it does seem for MS that what the district court said is in fact true. I believe that the district court statement is true. I believe it is error to remove those studies from your consideration because they did not isolate. Because I believe an expert looking at the totality of the evidence can look at both the epidemiology, which deals with mixture compounds, including the substances at issue in this case, and finds causal connection and additionally the mechanistic evidence and the animal evidence and find causation in the totality. So the key here, right, is the expert is supposed to be the expert. And so if the expert gives an explanation for why these studies are persuasive to him, that could still be a reliable opinion even if he doesn't have to, like, point to some other expert that has made that determination, right? I mean he can explain it. That's correct, Your Honor. And both in his report, in his deposition, and third, both is the wrong word, in his rebuttal report he talks about how these solvents are similar. So you would expect similar results. And then when you look at the animal studies where they're able to isolate particular chemicals, you see the same results. And you just can't do that in human studies in the same way because they are not forward-looking and it's unethical to give someone styrene to see how they react to it compared to someone who's not getting styrene. At some point you get to the level of a jury question about whether the jury says, okay, this expert is saying that he's deduced from these animal studies that this is a causal agent. You know, are we at that point, I guess, is the question. Yes, Your Honor. The question is whether the expert at this point is more likely than not reliable based upon the sufficient facts or data. And in this case the expert has a reliable foundation to reach the conclusion in the totality. What is the reliable methodology that an expert needs to do? So we need to take sort of a step back here. You want to focus specifically on the district court and lines that it set in its order. But the principle under Daubert and 702 is to focus on what are the reliable principles and whether those reliable principles were applied for a reliable opinion here. So what are the reliable principles under epidemiology? What does an expert need to do? Sure. So in this case the expert looks at the literature out there and he looked at both individual studies as well as meta-analysis that looked at a broad swath of studies and saw whether the studies were showing an association between these, first, solvents generally and these outcomes, second, solvents including these specific chemicals and these outcomes, and third, he looked at studies dealing with animals that tried to isolate these specific chemicals. Okay. So that's step one is to find some studies which show an association between the agent, not just any agent, but the agents at issue here, and the disease. What's the next step? The next step is to consider and weigh whether that is enough to be more likely than not demonstrative of causation. And that's the conclusion. All right. There's two things that have to happen within those steps, though. At the first step you identify these things, but when you're identifying them what must an expert do as he's going through them? He reads the studies, considers them with his experience and background, and considers them against the other literature that's out there. So what the district court said here is that, and the record seems to support, is that Dr. Cantor specifically didn't include negative information in his report in discussing them when discussing whether there was an association or not. A, did the district court say that, and B, is that, in fact, what the record shows? The district court did say that, and that was my second point. Okay. The problem with that point is it's inaccurate. And the other problem is a rule. Did he admit in his deposition that there were, in fact, negative studies for which he did not include in his report? I believe he said there are studies that did not show a positive association, and he did include those. So that was another. Did he not testify that there were reports for which either did not indicate a statistically significant association or found no association for which he did not include? In other words, negative reports for which he explicitly said, I didn't include that information. I don't think that's accurate, Your Honor. And defendants expert, Dr. Mundt, gave an extensive report that looked at hundreds of pieces of studies, and our expert looked at each thing in there and gave a rebuttal.  So what we said is that an expert needs to identify an association. He needs to rule out alternative explanations, in other words, other chemicals. And, for example, when doing that, has to look at the limitations of studies like chance, that something just happens as a matter of chance, in other words, statistical significance, and biases that come from reporting these things. The district court found that that didn't happen here. In the report, did those things happen? Was he critical, or did these things get teased out later when someone bothered to look under the hood and said, yes, you found an association, but there actually isn't a statistically significant, right? He talked about the statistical significance and the degree of association, the beginning point and the end point. So you have, with the p-value, you have the bottom and the top. And if the bottom of it is above 1.0... Right, if it's 95% or not... Yes, and he gave those ranges for the RISE study, for example, which is one of the ones that the district court cited testimony in relation to. And so those are in his report... Did he exclude, did he rule out alternative explanations? For the end results, I believe... In his report, people get cancer for lots of reasons. Did he rule out alternative explanations in his report? In his specific causation reports, yes. But alternative, did he rule out? So for each plaintiff, he ruled out whether they had a history of these conditions, whether they were genetically predisposed, whether they were smokers. And so for the specific causation reports he did, he did a full differential diagnosis... Not in the general causation? Well, he didn't have the plaintiffs before him for the general causation. Because the point of general causation is just to say, does this generally cause these conditions in, like, any population? Can it? All right, and then as the second part of the test, you have to, in evaluating the causation, you have to do an analysis of the Bradford Hill factors and have to actually explain why weighing all these, the negative and the positive, including the negative that isn't bothered to be included in the report, why all that mixed together means that there is, in fact, causation or not causation. Where is that in his report? More than the conclusory, I did this. Your Honor, that is not in his report, except it is a rebuttal report. But his explanation was that... Even in the rebuttal report, it's just, I did this. It's not, he doesn't go through each factor, weigh them together and say why he applied weight to this one and that one, and despite the weight, made the conclusion that he did. That's correct for his general report. He did that in his rebuttal report, but the reason he didn't put it in his general report is his primary methodology was looking at the totality of the evidence and not the Bradford Hill. It was the weight of the evidence methodology, which is distinct from the Bradford Hill methodology. Haven't we said that good epidemiology, in other words, the science, the reliable methods of epidemiology, require an analysis of Bradford Hill? I don't believe this Court has required experts to use Bradford Hill as opposed to the weight of the evidence methodology, and other courts... Let me ask it this way. Have we found that a district court didn't abuse its discretion by finding that an expert didn't reliably apply Bradford Hill in doing epidemiology? This Court has not ruled one way or the other on the weight of the evidence methodology. Other circuits have approved it, and no circuits have disapproved the weight of the evidence methodology. I want to talk about this Bradford Hill thing, too. It seems like there are at least some circuits that have suggested that you have to use Bradford Hill, but perhaps those cases are best interpreted as if you do use Bradford Hill, then you have to make it reliable. I guess... How do we need to read those other circuits? That's how I read those cases, and when you look at when those circuits have addressed weight of the evidence methodology, all of them have approved it. The Third Circuit has approved it. The First Circuit has approved it. I believe the Seventh and the Ninth as well. This Court has not yet ruled on it, whether that's a permissible methodology. What do we say about that Deepwater Horizon case? That just seems... It seems very odd to me that we would sort of declare that there is one method of epidemiology that you have to apply, but that Deepwater Horizon case sort of seems like it's saying that, and it actually is not citing a bunch of... I mean, it does cite the Bradford Hill article, but it also cites the restatement of torts for that proposition, so there does seem to be some legal aspect suggesting you have to use Bradford Hill. Your Honor, we don't interpret the Deepwater case that broadly, and if you look at this Court's prior precedents, I don't think this Court was holding that Bradford Hill is the only way to go for an expert. And, again, circuits around the country have approved the weight of the evidence methodology and have not required Bradford Hill as the only way to go for general causation experts. Did the district court say... I mean, it seems like one of the things the district court was saying here was that you do, in fact, have to use Bradford Hill. Is that how you interpret the district court's opinion? I actually don't, Your Honor, because since then the district court has permitted Dr. Panagrahi in another context. Oh, actually, that was Bradford Hill. So I don't read the district court's opinion as requiring Bradford Hill, and I read the district court's opinion as saying what you do, you have to do it reliably, which is, I believe, what you were saying about this Court's reading of prior precedents for Bradford Hill, is if you use a Bradford Hill methodology, it has to be reliably applied. And I think the same is true for weight of the evidence. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Ryan Hopper for the Appellee Lockheed Martin. This Court should affirm the judgment of the district court for all of the reasons expressed in our brief, all of which warrant consideration, but I'd like to focus today on two key analytical gaps in Dr. Cantor's methodology, both of which the Court's already touched on. The first is the unreliable chemical analogy that it was at the heart of Dr. Cantor's general causation opinions, and the second, if we can reach it, is the dose response limitations in Dr. Cantor's opinions. It's just the dose response thing, that comes from Bradford Hill, right? There is a dose response consideration that can be applied in the context of a Bradford Hill analysis, but it's different than the types of limitations at issue in Dr. Cantor's opinions. Very briefly to expound on that, Your Honor, one of the factors, well, let me take a step back, if I may. To answer the Court's questions earlier, particularly Your Honors, Judge Brasher's, the guiding principle in an epidemiological analysis, including the Deepwater Horizon cases, is the expert applying the same level of intellectual rigor that we would expect of that expert in his or her field of study. So in epidemiology, as Judge Luck was referring to, there are two steps to evaluating causation. The first is identifying whether you can find an association at all, a real, genuine association, not one that's the result of chance or confounding. And then the second step is whether that association reflects causality, and that's where Bradford Hill considerations are often applied. Similar types of considerations along the lines of a weight of evidence analysis are applied, but they must be applied and applied reliably because that's the way that epidemiologists, in their course of study, evaluate whether an association is causation. What's different from the dose response issue I'd like to flag later, and also in the context of the second field today, is that we have an expert here who purported to base his causation opinions largely on epidemiology, but when he was asked whether, if he were correct, if there were cause-and-effect relationships between exposures to PCE, TCE, and styrene and any of the health conditions at issue here, would there be a dose-response relationship, and he testified yes, that there would be a linear no-threshold dose-response relationship where there are some doses that would pose virtually no risk. And when he were asked, okay, explain how then you would go about evaluating whether there's a material risk associated with some exposure, he said he didn't know. He didn't do it. Council, the district court didn't rule on dose-response at all. I mean, it essentially rejected your view, whether right or wrong, rejected your view that dose-response is something that needs to happen at the general causation stage, simply didn't evaluate it in its order here, at least outside of Bradford Hill. And ruled simply on applying epidemiology methodology and that it wasn't reliably applied here. So let's focus on that. That's correct, Your Honor. So the epidemiology issues here, it is undisputed that Dr. Kantor, to use MS as an entry point, was unable to identify a single association reported in any epidemiological study between PCE, TCE, and styrene specifically in the development of MS. Your opposing counsel, though, says that doesn't matter. In other words, at least at the association or step one stage, all you need to do is present some association of these chemicals, and that's for the later stages to sort of isolate to see whether those are causal effects. Is that correct or not? It's correct that that's the appellant's position. That is an incorrect statement of the law and the science. Tell me both law and science why that's wrong. The law comes from Ryder and McLean, and in Ryder and McLean, this court rejected essentially the exact line of reasoning that Dr. Kantor purported to apply here. I'll direct the court to one helpful aspect, or exchange from Dr. Kantor's deposition, Doc 279.1 at page 33, lines 12 to 21. Dr. Kantor testified that he thought of solvents as a class, quote, much in the same way that in medicine, when we have classes of medications, the medications are often more similar than they are different. That is the exact line of reasoning that the experts tried to apply in this court's Ryder case, in McLean case, that there are drug classes that can be treated alike. And what this court correctly observed is, that's called a chemical analogy, and if you're going to base an expert opinion on that presumption, the presumption has to be substantiated. And that's because small changes in chemical structure often do result in very significant changes in disease-specific toxicities. Is that a causation issue, though, or is that an association issue? That here is an association issue first, because when you and expert are evaluating whether an association exists at all between the substances at issue in our case and the health conditions at issue in our case, to draw that associational inference from a categorical solvent study, for example, you would have to substantiate the analogy that either all solvents are sufficiently alike, or there is some specific solvent that you can parse from a study, and Dr. Pancanter didn't do that here, and he admitted he didn't do that here. We would direct the court to document 279-1, again, his deposition exchange, where he was asked, what methodologies, how would you go about evaluating whether the dose-response relationship between one solvent and another solvent is the same? And he had an answer to that. He said, essentially, you would look at the different chemical structures, you would evaluate the data available on the specific chemicals, and then you would go through sort of a mechanistic analysis of whether those two chemicals dissolve and are metabolized in similar ways, and then we asked, quote, here's the question, did you try to perform that sort of comparison in this case between any solvents? Answer, no. And he previously testified that he didn't believe he was qualified to perform that sort of assessment. So we have here, Your Honor, a concession by Dr. Pancanter that not all solvents are alike, and then a concession that he didn't perform the methodology you would need to perform to substantiate the baseline chemical analogy that all solvents are alike that would be necessary for the epidemiology to... All right, let's get past that. Let's assume it's enough to show that some solvent with at least some of these chemicals in it that shows some significant connection to the disease at issue is enough for association. As I understand it, part of a reliable epidemiological analysis or review of the evidence requires that an expert rule out alternative explanations. Is that true at the general causation stage or is that only true at the specific causation stage? What's true at the general causation stage, Your Honor, and we direct the court to this... Court's Williams opinion, is you need to establish that there is a level of exposure that would... for a class of persons. So there's language from Williams. In that case, they said, Dr. Mink never adequately established whether the plaintiff's sensitivity to exposure placed her within the class of persons who would likely suffer from exposure at the range as he estimated. So to the extent that there are... Yeah, but the problem is that case goes to the dose response stuff. I'm not sure that that is an epidemiological evidence causation case. Well, one way you establish that there's a class of persons who could be affected by an exposure is through population-level epidemiology data. And so the distinction between toxicology and epidemiology breaks down when we start thinking about classes of exposure. All right, at the very least, though, you are required, you would agree, in the studies that you look at, to look at whether there were limitations in those studies like chance or bias or other confounding factors or anything like that, right? Absolutely, Your Honor. So just to follow up on one of the questions that Judge Luck asked. So when you're not talking about specific causation, when you're talking about, you know, just can something cause something, isn't the statistical significance in the study, doesn't that resolve whether it's likely that this thing is causing it versus some other factor? Statistical significance is one factor an epidemiologist can look at, but it's not determinative. And here's one reason why, Your Honor. You could have an association that is statistically significant. In other words, epidemiologists would say that's not attributable to chance, but is nonetheless the result of a problem with the study design or the study. And you could have some kind of like corollary factor, right? You know, like you could, I mean, I get that, but I guess, is there any reason to think that like that's what happened here, I suppose? I mean, those are things that could happen, but if he's pointing to statistically significant studies, why isn't, well, okay, there could be a confounding factor or the study could be designed poorly. Like, why isn't that a question for cross-examination and not excluding the expert entirely? It's not a question for cross-examination because it goes to the reliability, whether the expert reliably applied the aspect of epidemiological methodologies that parse chance from real causality. I guess the question here, though, is in looking at the facts of this case, because what the district court said is there's some negative stuff out there, both in the studies themselves and in other studies, that were simply not discussed and included by Dr. Kantor. Is that, in fact, right? I asked this question of your opposing counsel. He says, I'm wrong about this, and so now I want to give you an opportunity to address it. Is that, in fact, right? And is there, in fact, evidence in this record from which the district court could have found, yeah, you know what, there is negative stuff that he didn't bother including, and there's negative stuff about these reports that he didn't bother including in his? The court's correct. There was a deposition exchange to that effect. I don't have the citation at my fingertips, but you are correct, and I believe we cited it in our briefs, and it is cited in the district court's order. And that's the deposition exchange where it leads to that. I mean, the way I understood this is the district court has that sort of unusual line where it's like apparently there are other things out there because during his deposition, he said, like, there may be other things out there, right? Is that right? That is one line, yes, Your Honor. Well, I guess that seems different than saying there are definitely other studies that contradict these studies, and I didn't consider those in my report. It seems like the way I read that deposition is he's just, like, conceding that there may be other things out there. The high-level problem, Your Honor, is we have a district judge here who was tasked with exercising a gatekeeping function that required the judge not to take the expert's word for it. That's one of the prime directives from this court to district judges is you cannot take the expert's assurances that they reliably applied their methodology. Daubert requires more. And so then if you put yourself in the perspective of the district judge who has an expert report and has deposition testimony where nowhere in the affirmative expert report are the criteria that this expert purported to apply to parse causality from chance just does not exist. So we have an expert who claimed to have performed a weight-of-the-evidence analysis, didn't say how he was going to weigh the different criteria he would apply to assess causality, didn't show how he applied them, and that contravenes both Rule 26, which requires all of the reasons and bases in an expert report, and, frankly, just Rule 702, which places the onus on the proponent of the testimony to substantiate that all of the admissibility criteria in 702 are applied here. Sorry. No, you go ahead. Please. Okay. Just address this hypothetical for me because this is the kind of thing I'm concerned about. So let's say there's an expert report, he's a general causation expert, and it's about whether smoking causes lung cancer. And his expert report says, I'm a super great expert, I'm super qualified, here are the following 20 studies that show that smoking causes lung cancer because they all find a statistical significant correlation between smoking and lung cancer, and, you know, I think that's good enough, these studies are good enough. And then in his deposition, he's asked, like, aren't there some studies that don't show a statistically significant correlation? And he says, yeah, there are. Do we exclude that expert? We're not asking this court to... Well, no, answer my hypothetical. Yeah, draw a line to that extent. So it would depend on the studies, Your Honor, or it would depend on the weight. See, that seems crazy to me. That seems crazy that just because the expert sort of says, yeah, there are some other things out there that I, you know, like, I'm the expert, you're not the expert. I didn't consider those things. Like, why would we say that we're excluding that instead of saying, okay, if you can find those studies and bring those to the attention of the jury, then, like, have at it. We are not asking this court to establish that principle, and the district court didn't apply that. One thing to remember, Judge Brasher, is that the district court, when he was flagging the different aspects that ultimately led to the court's conclusion that the testimony as a whole was unreliable, is that he described that as one indicator of reliability combined with other indicia? Well, let's talk about that other indicia, because the studies themselves, so forget what wasn't in the reports. Right. What he did include. You're required to go through those studies to show if there's negative information in them, and including biases and percentages that don't show statistical significance. Was all of that done? Were there things that were left out of the study itself which were negative in the reports he actually did rely on? Were there negative? Was there negative information in any of those reports for which he left out of those studies which he left out of his expert report? Yes. For example, some of the Parkinson's studies that I believe the court alluded to earlier identified the exact analytical gap we have here that appears nowhere in Dr. Cantor's report, and that's the unsubstantiated solvent analogy. So, for example, if Dr. Cantor identified an ATSDR study or a National Institute of Health Sciences study that said it's possible that solvents can contribute to multiple sclerosis, one of the important factors that the scientists who put those studies together emphasized is that they're not trying to take the position that all solvents behave alike, and, in fact, they probably do not. So that's one example of a type of information that was not included in Dr. Cantor's report. You have little time left, but I want you to address something that Judge Brasher asked your opposing counsel, which is what is the law with regard to the Bradford-Hill factors regarding our circuit and specifically address the Deepwater Horizon case? The Deepwater Horizon case speaks to multiple different possible methodologies that can be used to establish general causation. The law with respect to epidemiology is, again, that if a plaintiff is going to try to prove general causation through epidemiology, then he or her needs to apply the epidemiology as experts would in the field, and the guidance from other circuits in this one is it's a two-step process. The labels you use for step two might change. Some experts call them Bradford-Hill considerations. Others call it a more general weight-of-the-evidence analysis. But what you do have to get to step two of that analysis, which is post-association identification and analyzing why you might believe that there is a causal relationship as opposed to just an association. The factors that epidemiologists consider are relatively well-established, repeatability, strength of association, consistency. In some respects, dose-response, although that doesn't mean that you can prove general causation by establishing a relationship at a dose that a plaintiff could never have experienced here. That's inconsistent with the Deepwater Horizon opinion. It's just impractical. But that is the law, Your Honor. The law is that you must do as epidemiologists do, and epidemiologists take the analysis to a second step. On the point of the dose-response limitations, I will add the entry point, Judge Luck, here is the appellant's assertion that the district court somehow erred by failing to consider Dr. Sahu, their exposure experts' modeled concentrations. And what distinguishes this case from potentially other cases in the past is that while we do have an expert who claimed to rely principally on epidemiology, we have those dose-response concessions. And that's a 702 and a Rule 56 problem. And the best way to think about it, in our view, is to put yourselves in the perspective of a lay juror who has heard from an expert that there are doses that pose virtually no risk, and they're going to ask themselves, okay, well, where are the concentrations modeled by Dr. Sahu on that range of risk? And the answer is they don't know because Dr. Cantor didn't know. He couldn't even read Dr. Sahu's units of measurement. So my apologies, Your Honor. I see that I've gone over time. Unless the court has any additional questions, I appreciate the court's consideration. Thank you. Of course, I haven't answered any additional questions, but I wanted to address the two cases that Lockheed's counsel pointed the court to because I think they actually show what the district court should have done here. So the Ryder case, it involved four studies. Three studies showed no relationship with a stroke. Actually, all four did not. And there were no animal studies at issue in the Ryder case to try to draw the analogy issue between one drug and another. And then secondarily, there was an additional problem in the Ryder case, which is that the studies at issue were talking about one type of stroke, which is an internal brain bleed, and the other type of stroke is where blood gets cut off to the brain. And so this court said the expert had no basis to either draw an analogy from one type of drug to another, didn't have animal studies to connect the dot or mechanistic data, but also didn't have any way to connect the dots from one study about a type of stroke that happens inside the brain from a type of stroke that prevents blood from getting to the brain. That's actually the same issue in the McLean case, which is the other case that counsel cited. It was also the internal brain bleed versus the preventing of blood from getting to the brain, the same issue of trying to draw an imperfect analogy, and there was no evidence or studies or mechanistic data to say to the court, other than the fact both have the broad term stroke at issue to say that they're similar, and there was no animal data or mechanistic data for the expert to explain why this chemical is similar to another chemical. And that's the difference here. Our expert actually does have studies that include organic solvents in general, organic solvents with these solvents in the mix for humans, and then also has mechanistic data that isolate these chemicals that show that in each circumstance, the substances perform as he would hypothesize that they would. And when you look at the totality, the expert reached a reliable conclusion that overall the totality of the evidence is enough for more likely than not. Thank you, Your Honors.